IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL SCOTT CAPPILLO,

        Plaintiff,

v.                                            Civil Action No.: 5:15–CV–28

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

For the reasons that follow, I recommend that the Plaintiff's Motion for Summary Judgement be **DENIED** and that the Commissioner's Motion for Summary Judgement be **GRANTED**.

## I. INTRODUCTION

On March 4, 2015, the Plaintiff, Michael Scott Cappillo ("Cappillo" or "Plaintiff"), filed this action for judicial review of an adverse decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. ECF No. 1. The Commissioner filed her Answer on May 6, 2015. ECF No. 6. The Plaintiff then filed his Motion for Summary Judgment on June 5, 2015. ECF No. 9. The Commissioner filed her Motion for Summary Judgment on July 6, 2015. ECF No. 11.

## II. FACTS

### A. Procedural History

Plaintiff applied for SSI benefits alleging a disability beginning on June 5, 2005. R. 20.

Plaintiff's claims were initially denied on December 14, 2011, and upon reconsideration on April 9, 2012. *Id.* On April 24, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* An ALJ hearing was held on July 30, 2013, before ALJ Jeffrey P. La Vicka. *Id.* Plaintiff, represented by Travis Miller, Esq., testified at the hearing, as did an impartial Vocational Expert ("VE"). *Id.* At the hearing, Mr. Miller moved to amend the onset date to the date of application, September 16, 2011. R. 45. On August 22, 2013, the ALJ found that based on the application for supplemental security income protectively filed on September 16, 2011, Plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act. Plaintiff appealed this decision to the Appeals Council, which denied his request for review on January 30, 2015. R. 1–5. Plaintiff then timely brought his claim to this Court.

**B. Medical History**

The following medical history is relevant to Cappillo's challenges to the ALJ's decision.

1. Mental impairments

In his Motion for Summary Judgment, Cappillo asserts that his "main disabling condition is his mental condition." ECF No. 10 at 5. However, "the record shows no treatment until 2012." R. 27. Since December 2011, Cappillo has been diagnosed with "Mood Disorder Due to Chronic Pain"; "Intermittent Explosive Disorder"; "Mood disorder, not otherwise specified, rule out bipolar disorder"; "Narcissistic personality disorder"; and "Bipolar disorder, type I." R. 839, 1063, 1069. Peggy Allman, M.A., initially saw Cappillo on December 6, 2011, and then she began seeing him for therapy regularly from January 2012 through the time of the ALJ hearing. ECF No. 10 at 3. Ms. Allman found that Cappillo's Global Assessment of Functioning (GAF) score was 60. R. 886. Conversely, Nubia Lluberes, M.D., who recently began seeing Cappillo in March 2013, reported that

Cappillo's GAF was only 40. R. 1069.

When Cappillo was first Seen by Ms. Allman on December 6, 2011, it was for a state agency consultative psychological evaluation. R. 837. Ms. Allman noted Cappillo reported mostly physical ailments as his chief complaints, but also reported "depression and anger." *Id.* Ms. Allman also documented that Cappillo represented that he had issues sleeping, anger and rage problems, and suffered from panic attacks. R. 838. Cappillo also told Ms. Allman that "he was not abusive of drugs or alcohol, but had experimented with drugs." *Id.* Ms. Allman also noted that Cappillo reported a "history of poor anger control. He denied property abuse nor physical abuse, but stated that he would yell loudly." R. 839–40. Ms. Allman's notes from sessions with Cappillo "reveal discussions of controlling anger, financial problems, and pain control, but they do not indicate any significant deficits in functioning or uncontrollable behaviors." R. 27; *see* R. 884–89, 920–30, 1043–48.

2. Physical impairments

Cappillo asserts that the mental impairments are his "main disabling condition," but his "physical impairments . . . limit his ability to work." ECF No. 10 at 5. Further, Cappillo's Motion for Summary Judgment is focused on alleged errors in the ALJ's decision regarding Cappillo's mental impairments. Thus, a full exploration of Cappillo's physical impairments is unnecessary, but some general background may be helpful in better understanding his mental impairments.

On September 27, 2011, Dr. Andrea Huffman noted low back pain, spasm of muscle, and hypertension as current diagnoses. R. 817. Cappillo had an MRI of his lumbar and cervical spine in May 2011, which showed mild degenerative changes in his lumbar spine and a small disc protrusion at C5-C6 with mild foraminal narrowing in his cervical spine. R. 825–26.

On May 2, 2012, Vincent Miele, M.D., saw Cappillo and ordered reimaging of his cervical,

thoracic, and lumbar spine. R. 954. Dr. Miele also noted that without "significant changes, it is likely that the patient will require nonsurgical pain management." *Id.* Cappillo was referred to, and seen by, the WVU pain clinic on January 29, 2013. R. 1015–18. At that initial appointment, Koshy M. Mathai, M.D., assessed Cappillo as having multisite body pain, low back pain, lumbar facet arthropathy, and chronic pain syndrome. R. 1018. Dr. Mathai scheduled Cappillo for lumbar medial branch block testing. *Id.*

Finally, although Cappillo underwent physical therapy, injections, and narcotic medications for his pain, the ALJ noted that "the record contains no treatment for any physical impairment" between February 2009 and April 2011. R. 26.

## C. Testimonial Evidence

Testimony was taken at the ALJ hearing held on July 30, 2013. R. 41–76. The following portions of the testimony are relevant to the disposition of this case.

1. <u>Cappillo's Testimony</u>

At the ALJ hearing, Cappillo acknowledged that this was the fifth time he remembered applying for social security benefits. R. 44–45. When asked what Cappillo contended were his severe impairments, Mr. Miller stated that "the severe impairments are bipolar disorder, depression, narcissistic personality disorder, degenerative disc disease of the lumbar and cervical spines, sleep apnea, carpal tunnel syndrome, and intermittent explosive disorder." R. 45.

Cappillo testified that he was forty-seven years old and lived with his fiancé and children. R. 46–48. He testified that he does not leave his house except for doctor's appointments. R. 49. Cappillo testified that he smoked a pack of cigarettes a day, and he used his daughter's monthly Social Security disbursement to pay for his cigarettes. R. 51.

Cappillo testified that he worked full time as a sales associate at Best Buy around "2006, 2007." R. 54. Cappillo also testified that Best Buy was the last place he worked, and that he had not looked for any jobs since about 2007. R. 56.

When the ALJ asked what condition most interferes with his ability to work, Cappillo said, with regard to his mental condition, that he just does not "like to deal with people anymore." R. 59. Cappillo elaborated, "when I get around people, I just - - I just can't to [sic] them anymore. I start getting angry and aggravated. It's - - I usually wind up getting into some kind of altercation."

The ALJ asked Cappillo about illegal drug use, and Cappillo testified that he had not used any illegal drugs since sometime in the 1980s. R. 61. Cappillo also testified that he does not drink alcohol. *Id.* When asked about chores around the house, Cappillo testified that he does not cook, clean, do dishes, do laundry, vacuum, or take out the garbage. R. 62–63.

When examined by his attorney, Cappillo stated that he had been going to Ms. Allman for therapy sessions for "a year plus" for an hour twice a month. R. 65–66. When asked if Ms. Allman had a good grasp on his situation, Cappillo testified that "out of everybody, she has a firm grasp." R. 66.

Mr. Miller then asked Cappillo, "[w]hat happens if someone criticizes you?" Cappillo responded, "[d]epending on the time, I get aggravated, agitated, and I probably go off, yell, scream, hoot, and holler." *Id.* Cappillo further testified that sometimes it escalates into a physical altercation. *Id.* However, when Mr. Miller asked when he had last been in a physical altercation, Cappillo avoided the question and instead offered an example of a recent yelling match over a parking spot. R. 66–67. Cappillo testified that this is one of the reasons he does not go anywhere because he fears snapping or "going off." R. 67.

2. <u>The Vocational Expert's Testimony</u>

A VE also testified at the hearing. R. 68. In characterizing Cappillo's past work at Best Buy, the VE stated it was as a household appliance salesperson. R. 70. "That job, according to the DOT, is light and semi-skilled with an SVP of 4." *Id.* The ALJ then asked the VE to

> assume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform light work with a sit-stand option, with allowance to alternate sitting or standing positions for up to 2 minutes at 30-minute intervals without going off task; who is limited to occasional posturals except no climbing of ladders, ropes, or scaffolds; who is limited to frequent handling, fingering, and feeling bilaterall; who requires a handheld assistive device for ambulating only and the contralateral upper extremity can be used to lift and carry up to exertional limits; who must avoid concentrated exposure to extreme cold and heat; concentrated exposure to wetness and humidity; concentrated exposure to excessive vibration; concentrated exposure to irritants; all exposure to unprotected work is limited to simple, routine, and repetitive tasks, requiring only simple decisions with no fast-paced production requirements and few work place changes; who is to have no interaction with the public and only occasional interaction with coworkers and supervisors.

R. 70–71. The ALJ asked the VE if "such an individual would be incapable of performing the claimants past work," and the VE confirmed that the assumed individual would not be able to perform such work. R. 71.

The ALJ then asked if any jobs existed that the individual could perform, and the VE testified that there were other jobs. *Id.* Specifically, the VE stated that the individual could do the work of an office helper, mail clerk, or sewing machine operator. *Id.* The ALJ asked the VE if his testimony was "consistent with and according to [his] experience and the DOT, and the VE explained that it was, except for the "sit-stand option posed in the hypothetical." Because a sit-stand option is not defined in the DOT, the VE's "opinion regarding the need for a sit-stand option and its impact on performing jobs is based on [his] having performed the job [himself] or [his] having formally analyzed the requirements of doing jobs . . . or [his] having become familiar with how jobs

are performed otherwise." R. 72–73.

The VE was then questioned by Mr. Miller. R. 73. Regarding Cappillo's anger issues, Mr. Miller only asked the VE one question: "if the hypothetical worker were to respond to appropriate criticism . . . with verbal altercations, at times possibly physical altercations, how would that be handled in this type of work?" R. 73–74. The VE testified that "employers typically will deal with an individual occurrence" without necessarily firing an employee, but someone repeatedly engaged in "verbal altercations with other employees, and particularly if it were to become physical, the individual would eventually lose their job." R. 74.

Finally, Mr. Miller read the following definition of "moderately severe" to the VE: "able to perform a designated task or function but has or will have noticeable difficulty, meaning distracted from job activity more than 20 percent of the work day or work week, i.e. more than one hour and up to two hours per day and one half to one day per week." *Id.* Mr. Miller also explained that "severe" is defined as "not able to perform the designated task or function of a regular, reliable, and sustained schedule." R. 74. Mr. Miller then continued by asking the VE if there would be any work for an individual who had moderately severe limitations in the areas of "maintaining attention and concentration for extended periods of time" and severe limitations "in performing activities within a schedule, maintaining regular attendance and/or being punctual within customary tolerances"? R. 74. The VE stated that the "individual would not be able to maintain employment." R. 75.

### III. ALJ FINDINGS

In determining whether Cappillo was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920. The first step in the process is determining whether a claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). If

the claimant is not engaging in substantial gainful activity, then the second step requires the ALJ to determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. 20 C.F.R. § 416.920(c). If the claimant has a severe impairment or combination of impairments, then the analysis moves to the third step in the sequence, which requires the ALJ to determine whether the claimant's impairments or combination of impairments meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R. § 416.920(d). If an impairment meets or equals a listed impairment, the claimant is disabled. *Id.* However, if the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite the limitations of his impairments. 20 C.F.R.§ 416.920(e). After determining the claimant's RFC, the ALJ must determine, at step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 416.920(f). If the claimant does not have the RFC to do his past relevant work, then he has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, at the final step in the process, that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983).

At step one of the sequential process, the ALJ found that Cappillo had not engaged in substantial gainful activity since September 16, 2011. R. 23. At step two, the ALJ found that Cappillo had the following severe impairments: arthritis, dextroscoliotic curvature of the lumbar spine, degenerative disc disease of the lumbar spine, obesity, cervical strain/history of small disc

herniation at C5-C6, bilateral carpel tunnel syndrome, mood disorder, and intermittent explosive disorder/personality disorder. *Id.* At the third step, the ALJ found that none of Cappillo's impairments met or medically equaled the severity of any of the impairments contained in the Listings. *Id.* In order to consider step four of the process, the ALJ determined that, since April 16, 2011, McQuain had the following RFC:

> [A] range of work activity that[] requires no more than a light level of physical exertion; affords a sit/stand option with an opportunity to alternate between sitting and standing for up to 2 minutes every 30 minutes throughout an eight hour work day without going off task; requires no climbing of ladders, ropes, or scaffolds and no more than occasional balancing, climbing ramps/stairs, crawling, crouching, stooping, or kneeling; accommodates the use of a hand held assistive device for ambulation; requires no more than frequent bilateral handling or fingering; avoid concentrated exposure to extreme heat or cold, humidity, wetness, excessive vibration, and irritants; avoids all exposure to hazardous machinery, commercial driving, and unprotected heights; involves only simple, routine, and repetitive tasks with simple decision making performed in an environment free of fast paced production requirements and involving few work place changes; and involves no more than occasional interaction with coworkers and supervisors and no interaction with the public (20 CFR 416.967(b)).

R. 24–25. At step four, the ALJ found that Cappillo was unable to perform any past relevant work. R. 29. However, at the final step, the ALJ found that, considering Cappillo's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Therefore, the ALJ concluded that Cappillo had not been disabled since September 16, 2011, the date Cappillo's application was filed. R. 30.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

In his Motion for Summary Judgment, Cappillo argues that the ALJ's decision is based on an error of law because the (1) ALJ failed to properly consider the treating physicians' opinions; (2) ALJ failed to properly consider the mental Listings; and (3) ALJ failed to account for all of Mr.

Cappillo's limitations in the RFC. ECF No. 10 at 7–12.

First, Cappillo argues that the ALJ improperly failed to consider Dr. Lluberes and Ms. Allman's opinions *Id.* at 8–9. Specifically, Cappillo argues that, under the regulations and case law, "the opinions from treating physicians will be given controlling weight if two conditions are met: 1) the opinions are supported by medically acceptable clinical and laboratory diagnostic techniques; and 2) the opinions are not inconsistent with other substantial evidence in the record." *Id.* at 7. Moreover, Cappillo contends that "any medical opinion that is not given controlling weight by the ALJ, must be weighed under the enumerated factors in the Regulations for assessing the amount of weight that is due." *Id.*

Second, Cappillo argues that the ALJ summarily concluded that his impairments did not meet or medically equal the criteria within the listings. Specifically, Cappillo asserts that "the ALJ failed to provide any discussion of the evidence he relied on to make these findings." *Id.* at 10. In short, Cappillo argues that the ALJ made an error of law by failing to adequately address the Listings and any medical evidence to support his findings. *Id.* at 10–11.

Third, in his final argument, Cappillo contends that the ALJ failed to account for all of his limitations in the RFC. *Id.* at 11. Specifically, Cappillo argues that the RFC "fails to include an limitation addressing Mr. Cappillo's most disabling impairment – rage and anger outbursts." *Id.* The ALJ included occasional contact with coworkers and supervisors, and Cappillo argues that "the ALJ entirely ignored the consequences of anger outbursts or verbal aggression during the 2 ½ hours of contact per workday this RFC finding would require." *Id.*

In her Motion for Summary Judgment, the Commissioner's first sentence focuses on

Cappillo's drug usage.[1] ECF No. 12. However, the Commissioner argues that the ALJ correctly applied the law, and substantial evidence supports his decision. *See* ECF No. 12. The Commissioner begins her argument by noting that the standard for establishing disability pursuant to the Act is stringent. *Id.* at 6. Next, the Commissioner addresses Cappillo's argument regarding the ALJ's treatment of Dr. Lluberes's and Ms. Allman's opinions. *Id.* at 7. The Commissioner argues that Cappillo is incorrect "because the ALJ complied with the regulations." *Id.*

Next, the Commissioner dismisses Cappillo's contention that the ALJ failed to adequately discuss the Listings. *Id.* at 9. The Commissioner argues that an ALJ "need not use particular language, or adhere to a particular format, and the ALJ decision should be 'read as a whole.'" *Id.* (quoting *Jones v. Barnhart*, 364 F. 3d 501, 506 (3d Cir. 2004)). The Commissioner alleges that, "[a]lthough the ALJ did not initially elaborate on his step three finding, later in his decision he did[,]" and he gave five reasons that Cappillo "had not proven that he has disabling mental impairments." *Id.* at 9.

Finally, the Commissioner argues that Cappillo's claim that the RFC did not account for his anger issues is "unfounded because the ALJ specifically considered them." The Commissioner asserts that the ALJ noted, "although [Cappillo] alleges uncontrollable anger, the record failed to show aggressive behavior or trouble with legal authorities . . . ."

## B. The Standards

---

[1] The Commissioner also begins the Statement of Facts section by reiterating the same point regarding Cappillo's drug usage. ECF No. 12 at 3. However, nowhere in the Commissioner's Motion does she argue that Mr. Cappillo's drug usage is actually relevant to his case. Reviewing the testimony from the ALJ hearing, Cappillo testified that he had not used illegal narcotics since the 1980s–more than two decades ago. Without any evidence or argument that Cappillo's drug usage is in any way relevant to this case, the Court finds the Commissioner's decision to lead off her Motion by focusing on irrelevant material a disingenuous and misleading attempt to discredit Cappillo's character before the Court.

1. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

2. Judicial Review

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664–65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C.

§§ 405(g), 1383(c)(3).

3. Claimant's Credibility

 "Because he had the opportunity to observe the demeanor and to determine the credibility

of the Claimant, the ALJ's observations concerning these questions are to be given great weight."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776

(E.D. Va. 1976)). "We will reverse an ALJ's credibility determination only if the Claimant can show

it was 'patently wrong'"  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v.

Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

**C. Discussion**

In review of Cappillo's Motion, he raises three errors for this Court to consider. First, he

alleges that the ALJ erred because he failed to properly consider the treating physicians' opinions.

Second, Cappillo argues that the ALJ erred because he failed to properly consider the mental Listing.

Third, Cappillo's final argument is that the ALJ failed to account for all of his limitations in crafting

Cappillo's RFC.

1. The weight given to Cappillo's treating physicians' opinions in the ALJ's Decision

Cappillo argues that the ALJ erred because he did not give appropriate weight to the opinions

of Dr. Lluberes and Ms. Allman, and he did not adequately explain what precise, specific medical

evidence he relied on to come to such a conclusion. *See* ECF No. 10 at 7. Cappillo contends that the

ALJ failed to weigh the treating physicians' opinions according to the regulations, which is required

when the opinions do not receive controlling weight. *Id.*

All medical opinions are to be considered in determining the disability status of a claimant.

20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(c) (2012). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Id.* (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. *Evans v. Heckler*, 734 F.2d 1012, 1015 (4th Cir. 1984).

The ALJ stated that "Nubia Lluberes, M.D. was considered but not given great weight." R. 28. Although the ALJ noted that Dr. Lluberes reported "that she has been treating him since 2010," there is no evidence within the record that Dr. Lluberes ever made such a claim. *Id.* However, this mistake appears to have no bearing on the ALJ's decision, and any impact that it may have had is meaningless so long as substantial evidence supports the ALJ's ultimate decision.

Cappillo further argues that the ALJ erred by failing "to provide specific reasons why he rejected the treating specialist's opinion and failed to discuss the required factors set forth in § 416.927(d) and in *Hines*." ECF No. 10 at 8. First, the Court in *Hines* did note that ALJs are required to evaluate and weigh medical opinions pursuant to a non-exhaustive list of factors. *Hines v.*

*Barnhart*, 453 F.3d 559, 563. However, the Court also said, "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.' No such evidence exists in this case." *Id.* at n2 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992))."[P]ersuasive contrary evidence" may not have existed in *Hines*, but it does in the present case.

The ALJ correctly noted that Dr. Lluberes began treating Cappillo in March 2013, and the ALJ determined this from reviewing the doctor's treatment notes. R. 28. The ALJ explained that he took issue with Cappillo's GAF score as determined by Dr. Lluberes because it was "not supported in the record for any consecutive period of 12 or more months." *Id.* The ALJ also considered that this doctor had only seen Cappillo "for a few months." *Id.* There is ample evidence in the record to contradict Dr. Lluberes opinion regarding Cappillo after three months of treatment. In her brief, the Commissioner points out that "there are at least four medical sources who made observations that contradict Dr. Lluberes's opinion." ECF No. 12 at 8. The ALJ's decision was based upon "the longitudinal evidence of record . . . ." R. 29.

The record includes the opinion of a state agency medical consultant given on April 7, 2012, that the ALJ gave great weight in his decision. R. 28. The ALJ found that the "opinion is most consistent with the totality of the evidence." *Id.* The medical consultant's report is telling: "[Cappillo] reports many limitations not supported by objective evidence from examining or treating source." R. 902. Moreover, the consultant noted issues with Cappillo's credibility; for example, "[r]ecent information from source indicates eye contact normal (although [Cappillo] contends that he cannot look people in the eye)." *Id.* Dr. Vincent, Dr. Mathai, and Dr. Navada all observed Cappillo at appointments exhibiting normal function, communication, and orientation. *See* R. 953,

959, 1036, 1038.

The ALJ also noted that although Cappillo "alleges uncontrollable anger, the record shows no aggressive behaviors or trouble with legal authorities." R. 28. During his testimony at the ALJ hearing, Cappillo's attorney asked him how long it had been since he was involved in a physical altercation; however, Cappillo never answered this question, and instead, he said, "[t]here was - - not [] a fistfight, but there was a yelling contest a couple weeks ago over a parking space." R. 67.

Furthermore, the ALJ noted that Cappillo "was not taking medication prior to 2013," but "he reported that since he began medication, his anger issues are less frequent." R. 28. The ALJ also cited the report of Rod McCullough, MA, a licensed psychologist that Cappillo was referred to for testing by Peggy Allman. R. 1051–54. McCullough's testing "detect[ed] exaggeration of psychological problems and symptoms and the tendency to report more problems than may be objectively present." R. 1053.

Overall, the ALJ's decision to give Cappillo's treating sources less weight is supported by substantial evidence contained within the record. Although the ALJ did not follow a rigid formulaic recitation of the factors, it is apparent from reviewing his decision and the record that the ALJ's conclusion is adequately supported and articulated under the regulations and current precedent.

2. The ALJ properly considered the Listings

Cappillo argues that "the ALJ failed to provide any discussion of the evidence he relied on . . ." in concluding that Cappillo does "not meet or medically equal the criteria of listings 12.04 and 12.08." ECF No. 10 at 10. Cappillo further contends that the ALJ's decision "is void of any explanation for the ALJ's conclusions regarding the mental Listings." *Id.*

As Cappillo notes, the ALJ must give an explanation supported by substantial evidence for his decision that Cappillo did not meet the Listings to be upheld on review. However, Cappillo incorrectly asserts that the ALJ must follow some specific rigid analysis in writing his decision. Courts have routinely found that "an ALJ is not required to use particular format in conducting his analysis, but the decision must demonstrate that there is sufficient development of the record and explanation of findings to permit meaningful review." *Ryan v. Astrue*, Civ. Action No. 5:09CV55, 2011 WL 541125 at *3 (Feb 8, 2009 N.D. W.Va.) (internal quotations and citations omitted).

In *Cook*, which Cappillo suggests supports his argument, the Fourth Circuit found it "simply impossible to tell whether there was substantial evidence to support the determination." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). *Cook* is factually distinguishable from the case *sub judice*. Here, it is possible to tell that substantial evidence exists to support the ALJ's conclusion. The ALJ clearly explained why he found Cappillo did not meet the Listing criteria:

> Further and more specifically as to the severity of the claimant's mental impairments, considered singly and in combination, they do not meet or medically equal the criteria of listings 12.04 and 12.08. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for 2 weeks.
>
> With regard to the claimant's mental status, the Administrative Law Judge concludes that the claimant has not evidenced, for any 12 consecutive months, any combination of debilitating psychological symptoms that has imposed any more than mild limitations in the daily activities or moderate limitation in social functioning or concentration, persistence, or pace. As to episodes of decompensation, which refers to exacerbation or increases in symptoms or signs accompanied by a loss of adaptive functioning as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace,

the claimant has failed to document any episodes of decompensation that have been of an extended duration. The claimant's mental impairments are discussed in more detail below.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of impairments (SSR 96-8p). *Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.*

R. 23–24 (emphasis added). In explaining how he determined Cappillo's RFC, with regard to the mental impairments, the ALJ explained that "the record shows no treatment until 2012." R. 27. At his initial consultation with Peggy Allman, Cappillo "complained of depression and mild sleep apnea, as well as his other physical impairments." *Id.* "A mental status examination revealed normal social functioning and concentration, persistence, and pace with some mildly deficient memory." *Id.*

The ALJ further noted that he reviewed Ms. Allman's treatment notes regarding Cappillo. *Id.* Those notes revealed "discussions of controlling anger, financial problems, and pain control, but they do not indicate any significant deficits in functioning or uncontrollable behaviors. Id; *see also* R. 884–89, 920–30, 1043–48. Moreover, the ALJ explained, "treatment notes in March 2013 indicate that [Cappillo's] depression slightly improved with better pain control[,] and a mental status evaluation with his neurologist in February 2013 was normal." R. 27.

18

The ALJ then discussed the "few sessions" Cappillo had with his psychiatrist beginning in March 2013. *Id.* After reviewing mental status evaluations from these sessions, the ALJ found that they "revealed fair grooming and fair hygiene; good eye contact; normal speech; logical and goal directed thought processes; fair insight and judgment; and no suicidal or homicidal ideation." *Id.* The ALJ also noted that Cappillo was "diagnosed with mood disorder/bipolar disorder and [narcissistic] personality disorder." *Id.* Cappillo also began taking medication, "but stopped on his own because he reported feeling 'too sleepy.'" *Id.* His medication was switched in June 2013, and Cappillo "reported that he was tolerating his new medication well and was only occasionally feeling 'somewhat more angry.'" *Id.*

The ALJ explained that although Cappillo "has been diagnosed with mental impairments, he has not had any emergency room visits or hospitalizations," and "mental status examinations showed no significant deficits in functioning." R. 28. Further, although Cappillo "alleges uncontrollable anger, the record shows no aggressive behaviors or trouble with legal authorities, and he reported that since he began medication, his anger issues are less frequent." *Id.*

Contrary to Cappillo's contentions in his Motion for Summary Judgment, the ALJ did discuss and explain how he concluded that Cappillo's impairments did not meet or exceed the Listings. Accordingly, the Court finds that there is substantial evidence to support the ALJ's decision that Cappillo's condition did not equal or exceed the Listings, and the ALJ made no error of law in reaching that decision.

3. Adequacy of the ALJ's RFC

Cappillo argues that the RFC "fails to include any limitation addressing [his] most disabling impairment – rage and anger outbursts. There is no mention in the RFC finding of anger outbursts

19

or verbal aggression." Although the RFC does not provide a limitation for "rage and anger outbursts," the ALJ thoroughly explained his decision not to include such a limitation.

The ALJ explicitly stated that although Cappillo "alleges uncontrollable anger, the record shows no aggressive behaviors or trouble with legal authorities." R. 28. The ALJ also noted that Cappillo reported that the frequency of his anger issues decreased since he began taking medication. *Id.* Moreover, the ALJ did not find Cappillo entirely credible. R. 26. However, the ALJ noted that Cappillo "has medically determinable impairments that could reasonably be expected to cause some of the symptoms described, but not to the frequency or debilitating degree of severity alleged, as discussed below." *Id.* In addition to other supporting evidence the ALJ cited to support this conclusion, he noted that Rod McCullough, an examining psychologist, reported "that the claimant tended to exaggerate his problems and symptoms." R. 28.

The Court "will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)). Cappillo has failed to meet the high burden of showing that the ALJ's credibility determination was "patently wrong" in this case.

The ALJ thoroughly explained why he declined to include the limitation Cappillo argues should have been included. Therefore, the Court finds that no error of law was made in determining Cappillo's RFC and it is supported by substantial evidence.

## V. RECOMMENDATION

After reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.      Plaintiff's Motion for Summary Judgment be **DENIED**. ECF No. 9.

2.      Commissioner's Motion for Summary Judgment be **GRANTED**. ECF No. 11

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).


DATED: October 15, 2015                          /s/ James E. Seibert
                                                 JAMES E. SEIBERT
                                                 UNITED STATES MAGISTRATE JUDGE